# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| ALLIED WORLD SPECIALTY INSURANCE COMPANY F/K/A DARWIN NATIONAL ASSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>BLUE CROSS AND BLUE SHIELD OF KANSAS, INC.,<br><br>Defendant. | Case No. 2:18-cv-2515 |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff Allied World Specialty Insurance Company f/k/a Darwin National Assurance Company ("Allied World") brings this action seeking declaratory relief against the Defendant Blue Cross and Blue Shield of Kansas, Inc. ("BCBS-KS") and alleges:

### Parties, Jurisdiction and Venue

1. This is a diversity action for declaratory relief pursuant to 28 U.S.C. § 2201 to declare the rights and other legal relations of the parties regarding an insurance policy issued by Allied World.

2. Allied World is a corporation organized and existing under the laws of the State of Arkansas with its principal place of business in the State of New York.

3. BCBS-KS is a corporation organized and existing under the laws of the State of Kansas with its principal place of business in the State of Kansas.

1

4. This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a). There is complete diversity of citizenship between Allied World and BCBS-KS. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5. This Court has personal jurisdiction over BCBS-KS, and venue is proper in this District under 28 U.S.C. § 1391.

6. This action is brought pursuant to 28 U.S.C. § 2201, which provides that the Court may declare the rights and other legal relations of the parties. Allied World and BCBS-KS are both parties having an interest in the insurance policies referenced herein.

## Background Facts

*The MDL Action*

7. In 2012, several class action lawsuits were filed by providers and subscribers against multiple Blue Cross Blue Shield entities or member plans ("Blues") and the Blue Cross Blue Shield Association ("BCBSA"), alleging violations of federal antitrust laws. The lawsuits allege generally that the Blues and the BCBSA conspired to leverage their economic power and market dominance to under-compensate healthcare providers for their services and to increase healthcare costs to subscribers by coordinating their operations and limiting their activities through restrictions in their trademark licenses.

8. On December 12, 2012, the Judicial Panel on Multidistrict Litigation consolidated and transferred several such actions to the United States District Court for the Northern District of Alabama, thus creating the MDL litigation referred to as <u>In Re:</u>

<u>Blue Cross Blue Shield Antitrust Litigation</u>, Master File No 2:13-cv-20000-RDP (the "MDL Action"). A copy of the December 12, 2012 MDL Transfer Order is attached hereto as Exhibit 1. In consolidating the providers' and the subscribers' actions, the MDL Panel found: "Here, the actions involve substantial common questions of fact relating to the state BCBS entities' relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity to exclusive service areas, among other restrictions." MDL Transfer Order at 2.

9. Pursuant to an Order issued by the MDL Court, two consolidated complaints were filed in the MDL Action on July 1, 2013, one for the "subscriber track" (the "Subscriber Complaint") and the other for the "provider track" (the "Provider Complaint"). A copy of the Subscriber Track Third Amended Consolidated Class Action Complaint is attached hereto as Exhibit 2; a copy of the Consolidated Fourth Amended Provider Complaint is attached hereto as Exhibit 3. BCBS-KS was named as a defendant in the Provider Complaint and in the Subscriber Complaint.

10. The Provider Complaint alleges that the Blues have been engaged for many years in an agreement not to compete against one another, but instead to cooperate and coordinate their activities on a nationwide basis in order to maximize their profits. The Complaint claims that the Blues agreed to cease competing and to impose operational uniformity on themselves decades ago by carving out exclusive service areas, setting up their national programs (including Blue Card), and establishing BCBSA's uniform rules and regulations. The Blues allegedly formalized their cooperation

agreement through the restrictions in their trademark licenses, such as the requirement of mandatory participation in the national programs.

11. The alleged conspiracy has perpetuated and strengthened the dominant market position each Blue enjoys in its specifically defined geographic market which, in turn, has enabled the Blues to force healthcare providers to accept anticompetitive rates and terms. The Provider Complaint alleges that healthcare providers have been subjected to lower rates and less favorable terms than would have been the case in the absence of the conspiracy.

12. The Provider Complaint seeks injunctive relief prohibiting the Blues, including BCBS-KS, from entering into, honoring, or enforcing any agreements that restrict territories or geographic areas, enjoining the Blues from utilizing the Blue Card Program to pay healthcare providers, and enjoining the Blues from developing any other program or structure that is intended to fix, or has the effect of fixing, prices paid to healthcare providers. The Provider Complaint also seeks money damages in the form of treble damages.

13. The Subscriber Complaint similarly alleges that the Blues have been engaged for many years in an agreement not to compete against one another, but instead to cooperate and coordinate their activities on a nationwide basis in order to maximize their profits. The Subscriber Complaint alleges that the Blues agreed to cease competing and to impose operational uniformity on themselves decades ago by carving out exclusive service areas and establishing BCBSA's uniform rules and regulations, including

BCBSA's Membership Standards and Guidelines.  The Blues allegedly formalized their cooperation agreement in their trademark licenses.

14. The Subscriber Complaint seeks injunctive relief prohibiting the Blues, including BCBS-KS, from entering into, honoring, or enforcing any agreements that restrict territories or geographic areas, and it also seeks to eliminate restrictions on the Blues' activities.  The Complaint further seeks money damages in the form of treble damages of the amount by which the plaintiffs allege premiums were artificially inflated above their competitive levels.

15. The Provider Complaint and the Subscriber Complaint are based upon the same or related conduct of the Blues relating to the Blues' "relationship with the national association, BCBSA, and the licensing agreements that limit the Blue Plans' activity . . . ." MDL Transfer Order at 2.  The Complaints differ only with respect to the alleged harm to the providers and to the subscribers.  Both Complaints seek damages in excess of this Court's jurisdictional limit and invoke federal question jurisdiction.

*Prior Related Litigation – <u>Love</u>*

16. BCBS-KS was also a defendant in a prior class action litigation styled <u>Love v. Blue Cross Blue Shield Assoc.</u>, No. 03-21296 (S.D. Fla.) (originally titled <u>Thomas v. Blue Cross Blue Shield Assoc.</u>) ("<u>Love</u>").  <u>Love</u> was a component of the MDL proceeding created in April 2000, and styled <u>In re Managed Care Litigation</u>, No. 1:00-MDL-1334.  A copy of Plaintiffs' Corrected Sixth (and final) Amended Class Action Complaint is attached as Exhibit 4.

17. Like the present MDL Action, <u>Love</u> was based on the theory that the Blues for many years have not competed against one another, but instead have engaged in an agreement to cooperate and coordinate their activities on a nationwide basis in order to maximize their profits.

18. The <u>Love</u> plaintiffs alleged that the Blues are not competitors, but instead provide health services only in individual distinct geographic regions, and that the individual Blues have market power in their respective regions. The plaintiffs further alleged that the Blues use their market power to harm providers by forcing them to accept unfavorable reimbursements.

19. The Blues allegedly agreed to cease competing and to impose operational uniformity on themselves decades ago by agreeing to operate in distinct geographic regions, setting up their national programs (including Blue Card), and establishing BCBSA's uniform rules and regulations.

20. The Blues formalized their alleged cooperation agreement in their trademark licenses. The Complaint cites the absence of Blue-on-Blue competition – and the resulting market dominance each Blue has acquired as a result – as well as the operational uniformity among the Blues required by their trademark licenses (including the requirement of mandatory participation in the Blue Card Program) as evidence that the Blues have conspired.

21. The plaintiffs in <u>Love</u> alleged that the Blues engaged in a common scheme to systematically deny, delay, and diminish payments to providers. Similar to the Provider and Subscriber Complaints, the <u>Love</u> litigation was based on the restrictions in

the Blues' trademark licenses, on the Blues' relationship with BCBSA, and on the Blues' long history and practice of national coordination and cooperation.

22. In 2009, the <u>Love</u> court dismissed the Plaintiffs' Sixth Amended Complaint with prejudice and issued a Final Judgment in favor of BCBS-KS and eight other Blues.

*The E&O Policy*

23. Allied World issued a Managed Care Organization Errors and Omissions Liability Insurance Policy, policy number 0303-4114 to BCBS-KS for the policy period July 1, 2012 through October 1, 2013, that provided certain coverage to the insured in excess of this Court's jurisdictional threshold pursuant to the policy's terms, conditions, and exclusions ("E&O Policy"). A copy of the E&O Policy is attached hereto as Exhibit 5.

24. The Insuring Agreement in the E&O Policy provides:

> The **Underwriter** will pay on behalf of any **Insured Loss** which the **Insured** is legally obligated to pay as a result of a **Claim** that is first made against the **Insured** during the **Policy Period** or during any applicable Extended Reporting Period.

(E&O Policy, § I.)

25. The term "**Claim**" is defined, in relevant part, as "any written notice received by any **Insured** that a person or entity intends to hold an **Insured** responsible for a **Wrongful Act** which took place on or after the retroactive date listed in ITEM 7 of the Declarations." (E&O Policy, § IV, Definition (C).)

26. The term "**Wrongful Act**" is defined, in relevant part, as "any actual or alleged act, error or omission in the performance of, or any failure to perform, a

**Managed Care Activity** by any **Insured Entity** or by any **Insured Person** acting with the scope of his or her duties or capacity as such." (E&O Policy, § IV, Definition (W), as amended by Endorsement No. 25.)

27. The term **"Managed Care Activity,"** is defined in the E&O Policy as:

> any of the following services or activities: **Provider Selection; Utilization Review**; advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services**; establishing health care provider networks; reviewing the quality of **Medical Services** or providing quality assurance; design and/or implementation of financial incentive plans; wellness or health promotion education; development or implementation of clinical guidelines, practice parameters or protocols; triage for payment of **Medical Services**; and services or activities performed in the administration or management of health care or workers' compensation plans; in the Administration or Management of health care, consumer directed health care, behavioral health care, prescription drug, dental, vision, long or short term disability, life, automobile medical payments, or workers compensation plans, long term care, EAP services, and TPA services, any and all of which **Managed Care Activity** may be referred or sponsored to or by the Insured entity; insurance broker/agency services.

(E&O Policy, § IV, Definition (K), as amended by Endorsement No. 38.) Through Endorsement No. 10, "**Managed Care Activity**" includes "all such services and activities listed above, whether provided on paper, in person, electronically, or via any other medium." (E&O Policy, Endorsement 10.)

*The D&O Policy*

28. Allied World provided a HealthCare Organizations Directors and Officers Liability Insurance Policy, number 0303-4116 to BCBS-KS for the policy period July 1, 2012 to October 1, 2013, that provided certain coverage in excess of this court's minimal

jurisdictional threshold to the insured pursuant to the policy's terms, conditions and exclusions ("D&O Policy"). A copy of the D&O Policy is attached hereto as Exhibit 6.

29. The D&O Policy provides coverage for **Claims** first made during the **Policy Period** for **Wrongful Acts.** (D&O Policy, § I, Insuring Agreements.)

30. The D&O Policy defines "**Wrongful Acts**" as:

(1)   with respect to an **Insured Person**, any actual or alleged act, error, omission, neglect, breach of duty, breach of trust, misstatement, or misleading statement by an **Insured Person** in his or her capacity as such, or any matter claimed against an **Insured Person** by reason of his or her status as such;

(2)   with respect to an **Outside Entity Insured Person**, any actual or alleged act, error, omission, neglect, breach of duty, breach of trust, misstatement, or misleading statement by a person in his or her capacity as an **Outside Entity Insured Person** or any matter claimed against such **Outside Entity Insured Person** by reason of his or her status as such;

(3)   with respect to the **Company**, any actual or alleged act, error, omission, neglect, breach of duty, misstatement or misleading statement by the **Company**;

(4)   with respect to the **Company** and **Insured Persons**, any actual or alleged act, error or omission in connection with the performance of or failure to perform **Provider Selection Practices**; and

(5)   with respect to the **Company** and **Insured Persons**, any actual or alleged **Regulatory Wrongful Act.**

(D&O Policy, § II, Definition (GG).)

31. The D&O Policy defines "**Claim**" as any:

(1)   written demand for monetary, non-monetary or injunctive relief made against an **Insured**;

(2)   judicial, administrative or regulatory proceeding, whether civil or criminal, for monetary, non-monetary or injunctive relief

9

        commenced against an **Insured**, including any appeal therefrom, which is commenced by:

        (a)    service of a complaint or similar pleading;
        (b)    return of an indictment, information or similar document (in the case of a criminal proceeding); or
        (c)    receipt or filing of a notice of charges;

(3)    arbitration or mediation proceeding commenced against an **Insured** by service of a demand for arbitration or mediation;

(4)    formal civil or criminal investigation of an **Insured Person**, which is commenced by the filing or issuance of a notice of charges, Wells Notice, formal investigative order or similar document identifying such **Insured Person** as a person against whom a proceeding identified in paragraphs (2) or (3) above may be commenced;

(5)    formal administrative or regulatory investigation of an **Insured**, which is commenced by the filing or issuance of a notice of charges, formal investigative order or similar document identifying an **Insured** as a person or entity against whom a proceeding identified in paragraphs (2) or (3) above may be commenced;

(6)    written request to toll or waive the applicable statute of limitations, or to waive any contractual time bar, relating to a potential **Claim** against an **Insured** for a **Wrongful Act**;

(7)    official request for **Extradition** of any **Insured Person**, or the execution of a warrant for the arrest of any **Insured Person** where such execution is an element of **Extradition**.

A **Claim** shall be deemed first made when any **Insured** first receives notice of the **Claim**.

(D&O Policy, § II, Definition (D).)

    32.    The term "**Related Claims**" is defined as "all **Claims** for **Wrongful Acts** based upon, arising out of, directly or indirectly resulting from, or in consequence of, the same or related facts, circumstances, situations, transactions or events or the same or

related series of facts, circumstances, situations, transactions or events." (D&O Policy, § II, Definition (CC).)

33. "All **Related Claims** shall be deemed to be a single **Claim** made on the date which the earliest **Claim** within such **Related Claims** was first made, or when the earliest **Claim** within such **Related Claims** is treated as having been made in accordance with Section VII.C. above, whichever is earlier. In such event, only one Limit of Liability and one Retention shall apply." (D&O Policy, § VII.D.)

34. The D&O Policy defines "**Loss**" as:

(1) damages, settlements or judgments;
(2) pre-judgment or post-judgment interest;
(3) legal costs or attorneys fees awarded by a court in favor of the claimant;
(4) punitive or exemplary damages, or the multiple portion of any multiplied damages award, subject to any applicable Sublimit of Liability but only to the extent that such damages are insurable under the applicable law most favorable to the insurability of such damages;
(5) fines or penalties levied against an **Insured** for violation of the EMTALA; if insurable under law, subject to the applicable Sublimit of Liability set forth in 3.C. of the Declarations;
(6) fines or penalties levied against an **Insured** for a violation of HIPAA, if insurable under law, subject to the applicable Sublimit of Liability set forth in 3.C. of the Declarations;
(7) **Excess Benefits Transactions Excise Taxes**, if insurable under law, subject to the applicable Sublimit of Liability set forth in Item 3.C. of the Declarations;
(8) **Response Costs**, subject to the applicable Sublimit of Liability set forth in Item 3.C. of the Declarations;
(9) **Defense Costs**; and
(10) The costs of complying with any injunctive, declaratory or equitable relief, remedy or order.

"**Loss**" does not include:

(a) amounts which an **Insured** is not legally obligated to pay;

    (b)    taxes; other than as specifically included above in this Definition, and if insurable under law;

    (c)    fines or penalties, except as specifically provided for in this Definition or in an Endorsement to this Policy, and only if insurable under law;

    (d)    amounts deemed uninsurable under law; or

    (e)    costs or liability incurred by any **Insured** to modify any building or property to make it more accessible or accommodating to any disabled person, or in connection with any educational, sensitivity or other corporate program, policy or seminar.

However, this Coverage Section shall provide coverage for **Defense Costs** incurred in a **Claim** seeking amounts specified in paragraphs (a) through (f) above, subject to all other terms, conditions and exclusions of this Policy.

(D&O Policy, § II, Definition (R), as amended by Endorsement Nos. 6 and 7.)

35.    The D&O Policy includes the following exclusion:

This Policy shall not cover any **Loss** in connection with any **Claim**:

\* \* \*

N. alleging, arising out of, based upon, or attributable to, any actual or alleged act, error or omission in the performance of, or failure to perform, **Managed Care Activities** by any **Insured** or by any individual or entity for whose acts, errors or omissions an **Insured** is legally responsible, except that this Exclusion shall not apply to that portion of an otherwise covered **Claim** for **Provider Selection Practices**[.]

(D&O Policy, § III, Exclusion N.).

36.    The term **"Managed Care Activities"** is defined as follows:

[A]ny of the following services or activities: **Provider Selection Practices**; **Utilization Review**; advertising, marketing, selling, or enrollment for health care or workers' compensation plans; **Claim Services**; establishing health care provider networks; reviewing the quality of **Medical Services** or providing quality assurance; design and/or implementation of financial incentive plans; wellness or health promotion education; development or implementation of

12

Case 2:18-cv-02515-DDC-ADM Document 1 Filed 09/25/18 Page 13 of 17

clinical guidelines, practice parameters or protocols; triage for payment of **Medical Services**; and services or activities performed in the administration or management of health care, consumer directed health care, behavioral health, prescription drug, dental, vision, long or short term disability, life, automobile medical payment, or workers' compensation plans, Employee Assistance Program services, Third Party Administrator services, or insurance broker/insurance agency services and activities.

(D&O Policy, § II, Definition (T), as amended by Endorsement No. 10.)

37. The D&O Coverage Section provides that the D&O Policy shall not cover any **Loss** in connection with any **Claim:**

(A) arising out of, based upon or attributable to the gaining of any profit or financial advantage or improper or illegal remuneration by an **Insured,** if a final judgment or adjudication establishes that such **Insured** was not legally entitled to such profit or advantage or that such remuneration was improper or illegal;

(B) arising out of, based upon or attributable to any deliberate criminal or deliberate fraudulent act or any willful violation of law by an **Insured,** if a final judgment or adjudication in a legal proceeding other than one which is initiated by the **Insurer** to determine coverage under this Policy, establishes that such act or violation occurred.

In determining the applicability of Exclusions A. and B., the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, any **Insured Person** shall not be imputed to any other **Insured Person**; however, the facts pertaining to, the knowledge possessed by, or any **Wrongful Act** committed by, an **Insured Person** who is a past or current Chairman of the Board, Chief Executive Officer, President or Chief Financial Officer of a **Company** shall be imputed to such **Company**.

(D&O Policy, § III, Exclusions A and B, as amended by Endorsement No. 18.)

38. The D&O Coverage Section provides that the D&O Policy shall not cover any **Loss** in connection with any **Claim**:

13

    D.    alleging, arising out of, based upon or attributable to, as of the Pending or Prior Date set forth in Item 6. of the Declarations with respect to this Policy, any pending or prior: (1) litigation; or (2) administrative or regulatory proceeding or investigation, of which an **Insured** had notice, including any **Claim** alleging or derived from the same or essentially the same facts, or the same or related **Wrongful Acts**, as alleged in such pending or prior litigation or administrative or regulatory proceeding or investigation;

    E.    alleging, arising out of, based upon or attributable to the same or essentially the same facts alleged, or to the same or related **Wrongful Act(s)** alleged or contained, in any **Claim** which has been reported, or in any circumstances of which notice has been given, before the Inception Date of this Policy as set forth in Item 2. Of the Declarations, under any policy, whether excess or underlying, of which this Policy is a renewal or replacement or which it may succeed in time[.]

(D&O Policy, § III, Exclusions D and E, as amended by Endorsement 15.)

*The Parties' Dispute*

39. When the consolidated complaints in the MDL Action were filed, BCBS-KS provided notice to Allied World, requesting coverage under the E&O and D&O Policies for the Provider Complaint and the Subscriber Complaint.

40. In a letter dated March 4, 2014, Allied World agreed to reimburse Defense Expenses incurred by BCBS-KS in connection with the MDL Action under the E&O Policy, subject to a full reservation of rights to deny indemnity and subject to the right to seek repayment of such Defense Expenses in the event that it is determined that the Cliam is not covered. A copy of Allied World's reservation of rights letter dated March 4, 2014, is attached hereto as Exhibit 7.

41. In the same letter, Allied World denied coverage for the MDL Action under the D&O Policy due to the applicability of the Managed Care Activities exclusion.

Allied World specifically reserved its rights with respect to all exclusions, conditions and terms therein.

42. There is a bona fide present dispute between Allied World and BCBS-KS regarding whether Allied World's D&O Policy provides coverage to BCBS-KS for the MDL Action.

43. Allied World is entitled to a declaratory judgment construing the D&O Policy issued to BCBS-KS, resolving the dispute between the parties, and declaring that Allied World has no liability to BCBS-KS for any claims, losses, or other damages or liabilities asserted by claimants in the MDL Action under the D&O Policy.

## COUNT I
*Declaration of No Coverage under D&O Policy*

44. Allied World hereby incorporates by reference and re-alleges, as if fully stated herein, each and every allegation of Paragraphs 1 through 43 of this Complaint.

45. There is no coverage for the MDL Action and the cases consolidated therein under the D&O Policy for the following reasons:

(a) The MDL Action alleges acts done by BCBS-KS in the performance of **Managed Care Activities**. (D&O Policy, § III, Exclusion N.);

(b) The **Claim** is derived from essentially the same facts, or the same or related **Wrongful Acts**, as alleged in the prior Love litigation (D&O Policy, § III, Exclusion D.);

(c) The MDL Action is a **Related Claim** to the prior Love litigation, which was a claim first made prior to the Inception Date of the Policy (D&O Policy, § VII.D.);

15

    (d)  The **Claim** arises out of essentially the same facts, or the same or related **Wrongful Acts**, as alleged in the prior <u>Love</u> litigation, which is a **Claim** reported prior to the Inception Date of the D&O Policy. (D&O Policy, § III, Exclusion E, as amended by Endorsement No. 15.);

    (e)  plaintiffs in the MDL Action seek relief, and any settlement or judgment in the MDL Action would grant relief, that does not constitute Loss and/or is uninsurable as a matter of law. (D&O Policy, § II, Definition (R), as amended by Endorsement Nos. 6 and 7.); and

    (f)  the **Claim** is not covered under the Policy and Allied World has no obligation to pay any amount under the Policy.

  46.  Allied World is entitled to a declaratory judgment in its favor, stating that Allied World has no liability under the D&O Policy to BCBS-KS for any loss or other damage of any kind as alleged in the MDL Action Claim (or the separate actions consolidated therein) because The MDL Action alleges acts done by BCBS-KS in the performance of **Managed Care Activities,** the **Claim** is a **Related Claim** to the <u>Love</u> litigation, first made prior to the inception of the D&O Policy, and because the **Claim** is excluded under Exclusions (D) and (E). Moreover, Allied World has no obligation to pay any amounts under the D&O Policy because the relief sought by the plaintiffs in the MDL Action does not constitute Loss, is uninsurable as a matter of law, or is otherwise not covered under the D&O Policy.

  WHEREFORE, Allied World prays that the Court declare the rights of the parties and declare that Allied World has no liability to BCBS-KS under the D&O Policy for any

**Loss**, including **Defense Expenses**, that is the subject of the MDL Action (or the separate actions consolidated therein) and for such other and further relief as the Court may deem just and proper.

Respectfully submitted this 25th day of September, 2018.

**FRANKE SCHULTZ & MULLEN, PC**

*/s/ John L. Mullen*_____
JOHN L. MULLEN                #22994
CHRISTOPHER M. HARPER         #23273
8900 Ward Parkway
Kansas City, MO 64114
Phone: (816) 421-7100
Fax: (816) 421-7915
E-mail: jmullen@fsmlawfirm.com
charper@fsmlawfirm.com

**Attorneys for Allied World Surplus Lines Insurance Company f/k/a Darwin Select Insurance Company**